Joseph Steve DUARTE, Plaintiff,

v.

AGILENT TECHNOLOGIES, INC.,
a New York corporation,
Defendant.

No. CIV.A. 04–B–0298.

United States District Court,
D. Colorado.

March 31, 2005.

George C. Aucoin, Jr., Atty at Law, New Orleans, LA, for Plaintiff.

Thomas E.J. Hazard, Holland & Hart, LLP, Denver, CO, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

BABCOCK, Chief Judge.

Trial to the Court in this action for relief under the Uniformed Services Employ-

ment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301, *et seq.*, was held March 7, 2005 through March 9, 2005. Plaintiff Joseph Steve Duarte ("Duarte") claims that Defendant Agilent Technologies, Inc.'s ("Agilent") actions in reinstating his employment following a period of active military deployment and then terminating him from this position approximately four (4) months later constitute violations of Sections 4313(a)(2)(A) and 4316(c)(1) of USERRA.

Section 4313(a)(2)(A) of USERRA provides that a person entitled to reemployment under Section 4312 of USERRA shall be reemployed in the position of employment in which such person would have been employed if the continuous employment of such person had not been interrupted by military service or a position of like seniority, status, and pay, the duties of which the person is qualified to perform. Section 4316(c)(1) of USERRA provides that members of the armed services who are reemployed under Section 4312 of USERRA and who were employed for at least 180 days prior to reemployment cannot be discharged within one year of reemployment "except for cause."

For the following reasons, I find and conclude that Agilent violated Sections 4313(a)(2)(A) and 4316(c)(1) of USERRA in reemploying Duarte and then terminating him approximately four (4) months after he returned from active military duty. I therefore enter judgment in favor of Duarte as set forth below.

## I. Findings of Fact

I find the following facts based on a preponderance of the evidence.

Agilent is a technology company that manufactures and sells test and measurement equipment, semiconductors, and life sciences and chemical analysis products to customers worldwide. Originally a wholly-owned subsidiary of Hewlett–Packard Company ("HP"), Agilent was spun off from HP in 1999 and became a fully independent company on June 2, 2000.

From the end of fiscal year 2001 and through the third quarter of fiscal year 2003, Agilent reported net losses in seven consecutive quarters. To restore the company to profitability, Agilent undertook several costcutting initiatives. Among those initiatives was Agilent's Work Force Management Program (the "Program"), which consists of a set of guidelines to be used by Agilent's managers in terminating employees and thereby reducing their workforces.

Employees are to be selected for the Program under two scenarios. First, under the initial selection criterion, all employees involved in projects or other work slated for elimination are automatically designated for participation in the Program and termination. Second, under the secondary selection criteria, employees involved in projects or other work that will be downsized as a result of events such as re-structuring may be designated for participation in the Program and termination. Under this latter scenario, managers are to engage in a process of assessing the skills of their employees and comparing them to those needed by their business group.

Based in part on the use of the Program, Agilent reduced its workforce from 41,000 in fiscal year 2001 to 29,000 at the end of fiscal year 2003. In the fourth quarter of fiscal year 2003, Agilent posted net profits in the amount of $13 million following third quarter losses of $1.5 billion. Agilent also reported net profits for the first three quarters of fiscal year 2004.

Duarte was employed at HP and then Agilent for over 19 years. From Agilent's inception until his termination, Duarte was employed as a design consultant in Agi-

lent's Global Incentive Pay Organization ("GIPO"). GIPO is an infrastructure unit of Agilent responsible for evaluating incentive compensation pay plans used to pay the field sales teams of Agilent's five global business groups: Electronic Products and Solution Group ("EPSG"); Life Sciences and Chemical Analysis Group ("LSCA"); Automated Test Group ("ATG"); Semiconductor Products Group ("SPG"); and Communications Solutions Group ("CSG"). A design consultant from the GIPO unit is assigned to each of Agilent's business groups. This primary design consultant then assists the business group in developing its specific annual pay plans and incentive pay programs. The annual pay plan process typically begins in June and must be completed by the beginning of November.

During his employment with Agilent, Duarte, a member of the Marine Corp Reserves, was called up for active duty on two occasions. Duarte's first call-up was from October of 2001 until April of 2002. In April of 2002, Duarte returned to his job as a design consultant with Agilent. Initially upon his return, Henry Grimm was Duarte's manager. Sometime in June or July of 2002, however, Sue Brunker ("Brunker") assumed responsibility as Duarte's manager.

Duarte's second call-up for active duty occurred in November of 2002. At the time of this call-up, Duarte was assigned as the primary design consultant for the EPSG business group. Duarte returned from his second tour of duty in July 2003 and was reinstated to his employment as a design consultant with the GIPO unit. Although Duarte's pay and benefits remained the same, the nature of his responsibilities as a design consultant changed in that he was no longer acting as primary design consultant for EPSG or any of the five business groups served by GIPO. In-

stead, Duarte was assigned to a special benchmark survey project whereby he was to obtain information regarding how Agilent's competitors were compensating their sales forces and to assist the primary design consultants for the EPSG and LSCA business groups. Duarte was given this modified assignment because the annual pay plan design process for the upcoming year was already underway at the time of his return and it was decided that it would be too disruptive to that process to replace one of the acting primary design consultants with Duarte.

While Duarte was on his second tour of active military duty, Vicki Groninga ("Groninga") replaced Brunker as his manager. Groninga, the overall manager for the entire GIPO unit, had also assumed responsibility as manager for the design consultant team when Brunker, who was dissatisfied in this role, stepped down and was appointed the primary design consultant for the LSCA business group. These changes occurred on July 17, 2003, just days before Duarte returned to employment at Agilent on July 21, 2003.

Both the annual pay plan design process for fiscal year 2004 and Duarte's benchmarking project were scheduled to be completed by November 1, 2003. On Duarte's return, Groninga had planned to restore him to his position as a primary design consultant for one of the business groups. Until then, Groninga anticipated that Duarte would split his time equally between working on the benchmarking project and in assisting the primary design consultants with the annual pay plan design process for the EPSG and LSCA business groups. In actuality, however, Duarte spent 80—90% of his time working on the benchmarking project from the time he returned to employment at Agilent in July of 2003 until his termination in November of 2003.

During Duarte's second military leave of absence, Paola Gheis ("Gheis") assumed Duarte's responsibility as the primary design consultant for the EPSG business group. Gheis continued in this position upon Duarte's return. In addition to Brunker and Gheis, the other primary design consultant assignments upon Duarte's return in July 2003 were: Marco Negro ("Negro"), primary design consultant for both the ATG and CSG business groups, and Debye Wolf, primary design consultant for the SPG business group. Groninga was assisting Wolf with her responsibilities based on problems with Wolf's performance in this capacity.

In administering its incentive compensation plans for Agilent's sales force, the GIPO unit was utilizing a variety of systems. In December of 2002, Agilent allocated $4 million of its Human Resources budget to develop a project known as the Sales Incentive Management ("SIM") Project, the objective of which was to replace these different systems with a single system. In order to obtain approval for the SIM Project, Groninga committed to reducing her GIPO operating budget by $700,000 by the end of fiscal year 2004. The SIM Project was ultimately abandoned.

Faced with pressure to reduce costs, Groninga began evaluating the design consultant team. In connection with this evaluation, Groninga contacted the HR managers for each of the five business groups and discussed the skills needed by the primary design consultants and whether they were satisfied with the primary design consultant currently assigned to them. With the exception of Elizabeth Shen, then HR manager for the SPG business unit to which Wolfe was assigned, each of the five business managers expressed satisfaction with their current design consultant assignments.

Groninga also asked each of the five HR managers if they would like to have Duarte assigned as the primary design consultant to their business group. None of the five HR managers was interested in having Duarte assigned as the primary design consultant for their business group for reasons that ranged from concerns with his skills and performance to concerns over consistency in this position for their business unit. Only one of the HR managers consulted by Groninga, however, had worked directly with Duarte as a primary design consultant for one of Agilent's business groups and none of the HR managers had worked with Duarte since he returned from his second military deployment.

Groninga testified that based on her conversations with the HR managers, she determined that the critical skills of her design consultant team were not meeting the needs and expectations of the businesses units it served and that based on this situation, coupled with the pressure she had to reduce costs in the GIPO unit by $700,000, she decided to apply the Program to the design consultant team. To this end, Groninga prepared a critical skills assessment form for the design consultant team that identified the primary job functions and corresponding skills of a design consultant. Groninga then forwarded this form to Steve Remmel ("Remmel"), the HR manager for GIPO, for his review.

Upon receiving Remmel's approval of the critical skills assessment form she prepared, Groninga proceeded to complete this form for each of the five design consultants based on her personal observations. The assessment utilized admittedly subjective measurements. Out of a possible critical skills rating of 95, Brunker received a score of 77, Gheis received a score of 74, Negro received a score of 64,

Duarte received a score of 43, and Wolf received a score of 35. Duarte was the only design consultant who was not acting as a primary design consultant for one of Agilent's five business units at the time Groninga completed his critical skills assessment. Indeed, Duarte had not been assigned as a primary design consultant for one of the five business groups since Groninga had become manager of the design consultant team.

In applying the Program to GIPO's design consultant team, Groninga also looked at the most recent performance evaluations or Rank Feedback Forms ("RFF") for all primary design consultants. Duarte's 2002 RFF had been completed by Brunker, who acted as Duarte's manager for a period of only four months between his two military deployments. Duarte was provided with his 2002 RFF upon his return from his second tour of duty in July of 2003, and he objected to its content.

On the RFFs, each employee is assigned one of three numerical ranks with Rank 1 reflecting top performers and Rank 3 reflecting employees who meet expectations but do not perform at the Rank 1 or Rank 2 levels. Of the five design consultants, Gheis, Negro and Wolf had received Rank 2 from their managers on their 2002 RFFs, while Duarte had received a Rank 3. Duarte's 2002 RFF did not, however, reflect any required performance improvement.

Groninga forwarded the critical skills assessment forms she completed for each of the design consultants to Remmel for his review, along with her recommendation that Duarte and Wolf be terminated under the Program. Remmel reviewed the results and approved them. On November 10, 2003, Groninga notified Duarte of the decision to terminate his employment. Duarte's effective date of termination was to be November 17, 2003, which falls in the first quarter of Agilent's fiscal year 2004. Although Groninga and Remmel were aware of USERRA and consulted in-house counsel, its application to Duarte's situation was cursory at best. USERRA was something with which Agilent simply had no experience.

In a memo dated November 12, 2003, Duarte protested Groninga's decision selecting him for termination under the Program and alleged that his termination violated USERRA. Remmel summarily responded to Duarte's memo and stated that Agilent did not believe that USERRA prevented it from selecting Duarte for termination. In a follow-up response on November 15, 2003, Remmel noted that the benchmarking project Duarte had been assigned to and working on since he returned from his second tour of duty was being eliminated.

After Duarte and Wolf were terminated in November of 2003, GIPO had three design consultants for its five business units. In early 2004, Agilent issued a job posting for a design consultant with GIPO. Groninga testified that this posting was intended to solicit applications from candidates outside the company with experience in designing plans for channel sales business models who could serve as the primary design consultant for the SPG business unit. The posting itself, however, made no reference to channel sales and Duarte was qualified to fill the position as the posting was written. Ultimately, the posting was pulled and no outside hire was made. Instead, Marti Wilmes ("Wilmes"), an Agilent employee from the Mergers and Acquisition Department, was assigned as the primary design consultant for the SPG business unit. Because Wilmes was a loaned employee from another department, her salary and benefits were not paid out of GIPO's budget.

Also after Wolf and Duarte were terminated, Groninga assigned Anice Pemberton ("Pemberton"), who was employed in another capacity within GIPO, as the primary design consultant for the APG business unit. Groninga then took over Pemberton's former responsibilities with GIPO. Because Groninga moved Pemberton from another position within GIPO, assigning Pemberton to the design consultant team did not add to the GIPO budget. As a result of the assignments of Pemberton and Wilmes, GIPO continued to employ five design consultants after Duarte's termination.

From 2001 until Duarte and Wolf's terminations in November of 2003, no other GIPO employees were terminated under the Program. Following Duarte and Wolf's terminations, Groninga succeeded in reducing GIPO's operating budget by $825,000 by December of 2004 through a combination of employee attrition, transfers, reassignments, voluntary separations, and use of the Program.

At the time of his termination with Agilent, Duarte was earning $88,800, plus full benefits that were equivalent to 25% or more of his salary. Since his termination, Duarte has been actively seeking comparable employment, but had been unable to secure another position as of the time of trial. Upon his termination, Agilent paid Duarte $54,821, or approximately seven months pay in severance benefits.

## II. Conclusions of Law

Section 4312 of USERRA provides that members of the armed forces or reserves who properly notify employers of their need to take a military service-related absence; who take a cumulative absence of no more than five years; and who properly reapply or report to work are entitled to reemployment. At the commencement of the trial, the parties stipulated that Duarte had established this prima facie case under Section 4312 and was therefore entitled to reemployment at Agilent upon his return from active duty in July of 2003. It is also undisputed that under USERRA's protections the burden shifts to Agilent to prove by a preponderance of the evidence that Duarte was terminated for "cause." 38 U.S.C. § 4316(c)(1).

Section 4313(a)(2)(A) of USERRA provides that a person entitled to reemployment under Section 4312 of USERRA shall be reemployed in the position of employment in which such person would have been employed if the continuous employment of such person had not been interrupted by military service or a position of like seniority, status, and pay, the duties of which the person is qualified to perform. The term "status" as used in Section 4313 is not defined under USERRA and, therefore, must be accorded its ordinary and common meaning. *U.S. v. Markey*, 393 F.3d 1132, 1136 (10th Cir. 2004). Additionally, both USERRA and its predecessor statutes are to be liberally construed for the benefit of those who left private life to serve their country. *Alabama Power Co. v. Davis*, 431 U.S. 581, 584, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977); *Garrett v. Circuit City Stores, Inc.*, 338 F.Supp.2d 717, 722 (N.D.Tex.2004). *See also* H.R.Rep. No. 103–65 at 23 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2456 ("The Committee intends that these anti-discrimination provisions be broadly construed and strictly enforced"). It appears USERRA is *sui generis*. The protected class is unique to federal anti-discrimination employment law.

Here, although Duarte's title, pay, and benefits upon his return from active duty in July of 2003 were the same as they had been when he was called-up in November of 2002, the duties of his job as design

consultant were significantly different. Specifically, Duarte was no longer the primary design consultant for the EPSG group, but rather was providing minimal assistance to other primary design consultants and working on a special project. Although Groninga testified that she considered the benchmarking project to which Duarte was assigned to be important and a great opportunity for him, assignment to this project, as well as serving in an assistant role to other design consultants, resulted in Duarte's diminished status at Agilent.

I recognize that Agilent would have experienced some difficulty returning Duarte to his former position as primary design consultant for the EPSG group or for any of the business groups given the timing of his return in relation to that of the annual pay plan design process. But this does not excuse Agilent's failure to return Duarte to this position at the first available opportunity as Groninga had planned. At the very latest this would have been when the annual pay plan design process for fiscal year 2004 was completed by November 1, 2003. And, Agilent could have actively involved him in the annual pay plan design process for one of the business groups with appropriate assistance and supervision.

Under these circumstances, I conclude that Agilent violated 4313(a)(2)(A) of USERRA based on Duarte's diminished status upon his return to employment at Agilent. USERRA's stated purpose is to encourage service in the armed services by eliminating or minimizing the disadvantages members of the armed services experience in their civilian careers and employment as a result of their military services. 38 U.S.C. § 4301(a)(1). Duarte was disadvantaged as a result of his military deployment and the corresponding diminished responsibilities assigned to him upon his reemployment. Moreover, as discussed below, these diminished responsibilities that directly resulted from his military deployment played a significant role in Duarte's termination, thereby placing him at an even greater disadvantage as a result of his military service.

 Section 4316(c)(1) of USERRA provides that members of the armed services or reserves who are reemployed under Section 4312 and who were employed for at least 180 days prior to reemployment cannot be discharged within one year of reemployment "except for cause." "Cause" as used in Section 4316(c) is not defined in USERRA. Again though, both USERRA and its predecessor statutes are to be liberally construed and strictly enforced for the benefit of those who left private life to serve their country. *Alabama Power Co.*, *supra*; *Garrett*, *supra*; H.R.Rep. No. 103–65 (1993). Consistent with USERRA's purpose, I conclude that the term "cause" under USERRA must be construed and applied narrowly. Again, Agilent bears the burden of proving that Duarte was terminated for "cause." *Carter v. U.S.*, 407 F.2d 1238, 1244 (D.C.Cir. 1968).

 The legislative history of USERRA indicates that prior veterans' reemployment rights statutes and case law should be utilized in interpreting its provisions. *See* H.R.Rep. No. 103–65, at 19 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2452. This authority indicates that the discharge of reemployed military personnel due to the employer's adverse economic circumstances may be "for cause." *See e.g. Ruesterholtz v. Titeflex, Inc.*, 166 F.2d 335 (3rd Cir.1948). More generally, "the test which must be applied is whether or not the discharge by the employer was a reasonable one under the circumstances." *Kemp v. John Chatillon & Sons*, 169 F.2d 203, 206 (3d Cir.1948). In applying this

authority, I am mindful that USERRA was intended to strengthen prior veterans' reemployment rights statutes and that case law under prior statutes remains in full force and effect only to the extent that it is consistent with USERRA. H.R.Rep. No. 103–65 at 18–19 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2451–2452.

 Agilent was clearly faced with serious financial hardship in recent years. Notably, Agilent's net losses in the third quarter of fiscal year 2003 exceeded $1.5 billion. In addition, Groninga was committed to reducing GIPO's operating budget by $700,00. Groninga's commitment to reduce costs extended, however, through the end of fiscal year 2004. Duarte was terminated in the first quarter of fiscal year 2004 at a time when the Program had not been applied to any other GIPO employees for the preceding three years. The timing of Duarte's termination is problematic because Duarte was not given a fair opportunity to resume his previous duties under Groninga's management before she evaluated and ranked him against other employees who were performing like responsibilities. Duarte's status was diminished upon his return, and he was disadvantaged because of his second deployment. Indeed, the second deployment exacerbated the effects of the first.

It is true that none of the HR managers for Agilent's business groups expressed any interest in having Duarte assigned as their primary design consultant. But it does not follow that Groninga could not, and should not, have made such an assignment. Not only was such action required under Section 4313(a)(2)(A) of USERRA as discussed above, but such an assignment would also have lent credence to Agilent's argument that its termination of Duarte was reasonable under the circumstances. Under the circumstances, it was not reasonable for Groninga to assess Duarte's skills after supervising him for only a short time when he performed different tasks than the other members of the design consultant team against whom he was ranked. Although Groninga also relied to a degree on feedback from Brunker and the HR managers from the business groups in selecting Duarte for termination, this feedback was similarly flawed. First, Brunker acted as Duarte's manager for only a short period of time between his two military deployments. Secondly, the HR managers had only limited dealings with Duarte during which he was not, by and large, acting as primary design consultant for their respective business groups.

Also problematic to Agilent's argument that its termination of Duarte under the Program was reasonable and for cause is that the surrounding circumstances are not consistent with the guidelines of this Program. Remmel's November 15, 2003 email to Duarte strongly suggests that his assignment to and completion of the benchmarking survey was a factor in his selection for termination. Groninga denies that Duarte was terminated under the initial selection criterion for the Program, and she did in fact proceed as if Duarte was being terminated under the secondary selection criteria for the Program. However, since Remmel approved Groninga's decision to terminate Duarte, his belief that the initial selection criteria was applicable contradicts Agilent's argument that Duarte was terminated for cause. Duarte's assignment to the benchmarking project was of limited duration and was the direct result of his military service. Moreover, if Duarte's termination was under the secondary selection criteria for the Program as Groninga testified, a key element for application of this criteria is lacking in that there was no downsizing of the design consultant team. Significantly,

Agilent continues to employ five design consultants and there was no credible evidence that it ever intended to employ fewer than five. Even accepting Groninga's version of events, Agilent's argument that Duarte's termination was for cause and consistent with the Program is suspect.

I conclude that Agilent has failed to meet its burden of establishing that Duarte's termination within one year of his reemployment was for cause within the intent of USERRA. Specifically, I conclude that the timing of this action and the decisionmaking process that preceded Duarte's termination were not reasonable under the circumstances. This conclusion fosters USERRA's stated purpose to encourage service in the armed services by eliminating or minimizing the disadvantages members of the armed services experience in their civilian careers and employment as a result of their military services. 38 U.S.C. § 4301(a)(1). I do not question Groninga's motives while acting under budgetary stress. But Duarte paid a steep price for his military deployment during his employment with Agilent. Specifically, he was seriously disadvantaged as a result of his military deployment and the corresponding diminished status and responsibilities assigned to him upon his return. This is the harm USERRA was enacted to prevent.

Turning then to the question of damages, Section 4323(d)(1) of USERRA provides for an award of lost wages and benefits. In addition, liquidated damages may be awarded if the court determines that the employer's failure to comply with USERRA was "willful." As to damages, Duarte bears the burden of proof.

There is little authority interpreting USERRA's liquidated damages provision. Other federal statutes, however, contain similar provisions and the corresponding case law is therefore helpful on this issue.

In particular, in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), the United States Supreme Court interpreted the term "willful" under the Age Discrimination in Employment Act (the "ADEA") as meaning that an employer engaged in conduct known to be prohibited or engaged in conduct with reckless disregard of its prohibition.

■ Applying this standard to the present case, I conclude that Agilent did not willfully violate USERRA in reemploying and subsequently terminating Duarte. Though Agilent's actions constitute violations of USERRA's provisions, they were based on an exercise of business judgment in response to Agilent's financial hardship. Duarte's notice that he believed Agilent was in violation of USERRA does not alone warrant a finding of willful conduct. Key decisions regarding Duarte's employment had already been made at that point in time and the mere recognition that USERRA may be applicable is insufficient to establish willfulness. *See Trans World, supra*, 469 U.S. at 126, 105 S.Ct. 613 (violation of ADEA is not "willful" if employer simply knew of the potential applicability of the Act). Accordingly, I conclude that Duarte is not entitled to liquidated damages under Section 4323(d)(1)(C) of USERRA.

■ As for Duarte's lost wages and benefits, the primary evidence on this issue came from the testimony of John Butler ("Butler"), an expert witness in the field of economics. Butler calculated Duarte's lost wages and benefits under two different scenarios. Under both scenarios, Butler calculated the net present value of Duarte's backpay, consisting of wages and benefits, from the time of his termination through the date of trial at $114,500. In calculating this amount, Butler offset all income that Duarte had earned as a Ma-

rine reservist, but did not offset any amounts that Duarte earned in unemployment compensation or the amount of severance benefits that Agilent paid to him.

As for front pay, under the first scenario, Butler assumed that it would take Duarte 5.5 years to return to the level of income he enjoyed at Agilent and that he would re-enter the workplace at 80% of his salary at Agilent. Based on these assumptions, Butler calculated the net present value of Duarte's lost front pay at $115,900, for total lost wages and benefits in the amount of $230,400 under the first scenario. Under the second scenario, Butler assumed that Duarte would not return to the level of income he enjoyed at Agilent by the time he reached age 65 in 13 years and that he would re-enter the workplace at closer to 50% of his salary at Agilent. Based on these assumptions, Butler calculated the net present value of Duarte's lost front pay at $552,600, for total lost wages and benefits in the amount of $667,100 under the second scenario.

Butler testified that Duarte's actual damages fall somewhere between the two scenarios he presented and that, in his opinion, the second scenario is more realistic. The second scenario is also somewhat more consistent with Duarte's experience seeking employment in that most of the employment opportunities he has been pursuing pay significantly less than his position as a design consultant with Agilent.

Based on the evidence presented at trial, I conclude that Duarte shall be awarded back pay in the amount of $114,500 and front pay on the amount of $324,082. The amount of front pay awarded assumes that Duarte will re-enter the work force at closer to 50% of his salary at Agilent at the time of his termination as set forth under Butler's second scenario, but that he will return to the level of income that he

enjoyed at Agilent in 6 years. I further conclude that Agilent is entitled to an offset against Duarte's total lost wages and benefits for the $54,821 in severance benefits that Agilent paid to him. Accordingly, Duarte's total lost wages and benefits in the amount of $438,582 shall be reduced to $383,761 and judgment entered accordingly.

Section 4323(h)(2) of USERRA further provides that a prevailing plaintiff may be awarded reasonable attorney fees, expert witness fees, and other litigation expenses. Duarte shall file a motion regarding these expenses within 30 days of the date of this Order.

Accordingly, IT IS ORDERED that:

1. Judgment is entered in favor of Plaintiff Joseph Steve Duarte and against Defendant Agilent Technologies, Inc. on Plaintiff's claims for violation of Sections 4313(a)(2)(A) and 4316(c)(1) of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301, *et seq.*, for lost wages and benefits in the amount of $383,761;

2. Plaintiff Joseph Steve Duarte is also awarded prejudgment interest on the amount of $114,500, representing back pay;

3. Plaintiff Joseph Steve Duarte is also awarded postjudgment interest on the entire judgment amount of $383,761; and

4. Plaintiff has 30 days from the date of this Order to file a motion for reasonable attorney fees, expert witness fees, and other litigation expenses.