NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0136n.06
Filed: March 6, 2008

**No. 07-3093**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| KEVIN L. KOEHLER, ) | |
| ) | |
| Plaintiff-Appellee, ) | |
| ) | **On Appeal from the United** |
| v. ) | **States District Court  for the** |
| ) | **Southern District of Ohio** |
| PEPSIAMERICAS, INC., ) | |
| ) | |
| Defendant-Appellant. ) | |
| ) | |

BEFORE:      DAUGHTREY, MCKEAGUE, Circuit Judges; and, GWIN, District Judge.⌐*

GWIN, District Judge:

Defendant-Appellant PepsiAmericas, Inc. ("Pepsi" or "Appellant") appeals the order of the

District Court awarding liquidated and punitive damages to Plaintiff Kevin L. Koehler ("Koehler"

or "Appellee") after a non-jury trial.  With this appeal, Pepsi claims that there was insufficient

evidence to support the District Court's award of liquidated damages under the Uniformed Services

Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq*. ("USERRA"), and punitive

damages under Koehler's state-law conversion claim.  Appellant Pepsi claims that the evidence does

---

⌐* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

not establish that Pepsi acted in a willful, malicious, egregious, fraudulent, oppressive or insulting

manner and that the District Court therefore erred in awarding liquidated and punitive damages to

Koehler.  For the reasons that follow, we AFFIRM the judgment and order of the District Court.

## I.  Factual Background

Koehler began working with Pepsi in June 2000.  At times relevant to this case, he worked

as a Cincinnati-based route salesman for Pepsi.

On January 26, 2002, Appellee Koehler enlisted with the Army Reserve under an eight-year

contract.  From March through August 2002, he temporarily left Pepsi to attend initial active duty

training.[1]  After his return from training, in 2002 and 2003, Koehler faced attendance-related

discipline at work for the first time.  Under the company's attendance discipline system,[2] by May

16, 2003, Koehler had a total of 6.5 discipline points, some of which Pepsi documented as related

to his military duties.[3]

---

[1] Although Pepsi did not pay Koehler during this period, Pepsi's records from this time indicate that the company had placed Koehler on "leave with pay" based upon a "paid leave of absence."

[2] Pepsi has a "points" or "occurrences" system to address absenteeism in its workforce.  As points accumulate for a particular employee, the employee faces escalating consequences: first an oral warning, then a written reprimand, next a suspension, and ultimately, termination after eight points or occurrences.  Employees who provide adequate and appropriate notice for an absence due to military service are not supposed to receive points or occurrences for that absence.

[3] On September 17, 2002, Pepsi issued a written reprimand to Koehler for failing to call in sick to the designated hotline.  Koehler explained this failure by saying that Pepsi instituted the hotline procedure while he was away on military duty and therefore, he was unaware of it.
  In January 2003, with less than twenty-four hours notice, the Army ordered Koehler to report the following day for possible deployment.  After Koehler received the order, he informed Pepsi that same evening.  When Koehler missed work the next day, Pepsi charged him with a "floating holiday," similar to a paid personal day.
  In March 2003, the military again ordered Koehler to report from March 8-10, 2003 for possible deployment. Koehler missed three days of work (March 7, 10, 11).  Again, he presented the orders to Pepsi as soon as he received

Koehler made various attempts to resolve these discipline issues. He spoke to his supervisor, Don Ostholthoff, about being charged for absences related to his military service; however, Ostholthoff was non-responsive, "telling [Koehler] that it was out of his hands." Koehler filed two grievances through his union. Pepsi never addressed them. The Appellee also filed a complaint with the United States Department of Labor, Veterans Affairs and contacted the Judge Advocate General ("JAG") office.

On May 12, 2003, Koehler sent an e-mail to Pepsi through its corporate website. In his e-mail, Koehler threatened to publicize how Pepsi treats its employees who are also serving in the armed forces. On May 29, 2003, Dennis Berger, Pepsi's Vice President of Human Resources for the United States, responded and requested additional information. During their follow-up conversations, Plaintiff-Appellee Koehler provided additional detail regarding the attendance disputes and requested a copy of Pepsi's military leave policy. Berger ultimately set up a meeting between Koehler and Pepsi at the Cincinnati plant for June 17, 2003. He also e-mailed Pepsi's military leave policy to Koehler.

Effective through September 30, 2003, Pepsi's "Military Active Leave Policy and Procedures" stated in part:

**<u>Intent</u>**:

To bridge the gap between Military Pay and normal pay received, so that employee is kept whole and does not lose money by going onto military duty.

---

them. Pepsi charged Koehler with two days of absence (two points) for these three missed days.

On May 16, 2003, Pepsi charged Koehler with an additional half point for leaving 15-20 minutes early for preparation related to military duties.

**What type of Military service will be covered?**

> Employees who are called to active service will receive pay coordination while actively serving in the uniformed services. Service in one of the uniformed services is defined as active duty, active duty for training, initial active duty for training . . .

> All employees who voluntarily enlist into active duty in the military are not covered under this policy.

At trial, Koehler explained that the policy's exclusion for voluntary enlistment into active duty did not apply to him: "I voluntarily enlisted into the Reserve system. I was ordered to active duty."

After Koehler spoke with Berger, Nancy Carroll, the Human Resources Manager of Pepsi's Cincinnati plant, asked to speak with Koehler before the meeting that Berger had set up. Koehler testified that this initial meeting went poorly: "She was questioning everything I was doing, nitpicking everything, basically want[ing] to know how I could stand up and basically give them orders and tell them how they were going to do things."

On June 17, 2003, Pepsi held the meeting that Berger set up at its Cincinnati plant to address Koehler's absences related to military service. The following individuals attended the meeting: Al Pennington, Union Secretary; Shawn Reed, Union Steward; Don Ostholthoff, Koehler's immediate supervisor; Alan McGriff, Pepsi Region Manager; Major (then Captain) Brierton, Koehler's military unit commanding officer; and Nancy Carroll and Darlene Webber-Kauffman, from Cincinnati's Human Resources Department.

At the meeting, Human Resources Manager Carroll conceded that the attendance points Koehler challenged should be removed. She also implied that she was unaware of the connection between Koehler's absences and his military obligations. Koehler testified that she said something

-4-

resembling, "If we only had something in writing . . . ."[4]

At the meeting, Koehler also claimed that he was entitled to differential pay for his March-August 2002 absence under Pepsi's military policy. He provided copies of the USERRA and the Pepsi military policy that Berger had sent to him. There are different descriptions of what next occurred.

According to Koehler, Carroll stated, "Well, if we need to pay you, we'll pay you." After reading what Koehler presented to her, she said, "It looks like we need to pay you. Provide me with the documentation of what you made, and I will get everything taken care of." Army Major Brierton similarly testified that Carroll committed to paying Koehler at the meeting.

Carroll testified differently. After characterizing the policy as a "draft," she then stated that she had "never seen the policy before, didn't know what he was talking about, . . . would check with corporate legal and if, in fact, we owed him anything, we would take care of it."[5] In contrast to Koehler and Major Brierton's versions, Carroll testified that no commitment was made to pay Koehler at the meeting. McGriff, Pepsi's region manager, testified similarly to Carroll.

On the day after the meeting, June 18, 2003, Koehler withdrew his Department of Labor complaint as he had agreed to do in exchange for Pepsi's promises. Soon thereafter, he provided his

---

[4] As described previously in footnote 4, in contrast to this statement by Carroll, the evidence indicates that Koehler kept Pepsi informed of his military obligations as he became aware of them.

[5] With regard to Carroll's claimed ignorance of the policy, the District Court noted:

It is interesting to note that Nancy Carroll was on an e-mail distribution list dated December 18, 2001 that included an almost identical document to that which Mr. Berger provided to Plaintiff and that which Plaintiff provided to Carroll at the June 17th meeting. See Plaintiff Exh. 42, page 4.

*Koehler v. PepsiAmericas*, 2006 WL 2035650, *3, fn. 1 (S.D. Ohio 2006).

2002 military pay records to Carroll's office. Mary Rafidi, a Pepsi payroll employee, then called Koehler to request his assistance in interpreting the pay statements. Koehler testified that she assured him, "I would be receiving the check as soon as possible."

Koehler's bank records indicate that on July 3, 2003, Pepsi directly deposited $10,820.22 (the net pay allegedly owed) into his account. Then, on July 7, 2003, Pepsi withdrew that same amount. After the withdrawal, Koehler called Carroll's office. He spoke to Darlene Webber-Kauffman, who had also attended the June 17, 2003 meeting. According to Koehler, she told him: "We changed our minds. You don't deserve anything. You can let your attorney speak to our attorney." Koehler then retained counsel.

At trial, Carroll countered that after the meeting, Pepsi's legal counsel informed her that Koehler was not entitled to differential pay for his March-August 2002 absence. Carroll attempted to explain the deposit by saying that while she was waiting to hear from Pepsi's counsel, she had asked Webber-Kauffman to determine how much Pepsi would owe Koehler if the company decided to pay him. She testified, "Apparently, some wires were crossed, I'm guessing. I don't know. But, you know, I instructed Darlene, and Darlene knew that money should not have been deposited. So she did everything she could, and the money was reversed." She described the deposit as occurring with "no physical act," or "automatically." Pepsi provides no more explanation as to how or why the deposit took place. Carroll stated only that it was not Pepsi's intention to pay Koehler.

In a November 7, 2003 letter to Koehler's counsel, Pepsi's attorney, W. Scott Nehs, denied that Pepsi either deposited or withdrew the funds from Koehler's account. This was untrue.

Appellant Pepsi explains Nehs's false denial by saying he was mistaken.[6]

## II. Procedural Background

On November 29, 2004, Plaintiff-Appellee Koehler filed his amended complaint. With his complaint, he alleged that Defendant Pepsi's actions violated the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq*. ("USERRA"), were a breach of contract, and constituted conversion.

On July 11 and 12, 2006, the case proceeded to a bench trial without a jury. Much of the outcome of the case turned on the fact finder's perceptions regarding the credibility of the various witnesses. The District Court found Plaintiff Koehler credible and Human Resources Manager Carroll not credible:

> The Court finds Plaintiff and Major Breiton to be credible witnesses and the Court does not find Nancy Carroll, who is pivotal to Pepsi's defense, to be a credible witness and observes that the testimony of Alan McGriff and W. Scott Nehs was largely based upon information supplied to them from Ms. Carroll. Ms. Carroll's credibility is strained for a number of reasons including but not limited to the following: her assertion that the June 17, 2003 meeting was initiated at her suggestion; her insistence that there was no agreement between the parties at the conclusion of the meeting regarding Plaintiff's pay differential; her representation to Mr. Nehs, counsel for Pepsi, that funds were never deposited into Plaintiff's account; her description of Plaintiff's Exhibit No. 52 as a "draft Pepsi document"; and, her failure to acknowledge that someone at Pepsi had to initiate the action that resulted in the deposit in Plaintiff's account.

*Koehler v. PepsiAmericas*, 2006 WL 2035650, *1 (S.D. Ohio 2006).

---

[6]The Appellant goes on to place the blame for Nehs's mistake on Koehler: "Koehler presented evidence at trial that his bank account showed a deposit and then a withdrawal within a few days in July 2003. Koehler could have corrected Mr. Nehs's misimpression by simply providing a copy of his bank statement. Pepsi could then have dealt with the matter directly. Instead, Koehler filed suit."

Defendant Pepsi moved for judgment at both the close of Koehler's case as well as the close of all evidence. The District Court denied both motions. On July 18, 2006, the District Court addressed each of Koehler's three claims for relief in its Opinion and Order. *See Koehler v. PepsiAmericas*, 2006 WL 2035650 (S.D. Ohio 2006). With regard to Koehler's USERRA claim, the District Court found:

> that a benefit was conferred upon Plaintiff by operation of Pepsi's own policy and that this policy was reinforced by its own practice in the agreement that was reached at the June 17th meeting. As a member of the Army Reserves, Plaintiff was entitled to this benefit. Since Pepsi denied this benefit to Plaintiff in violation of 38 U.S.C. § 4311 the Court finds that Plaintiff is entitled to differential pay in the gross amount of $16,962.86. The Court further finds that this benefit was improperly and wilfully withheld from Plaintiff entitling Plaintiff to double damages.

*Koehler*, 2006 WL at *4.

As to Plaintiff-Appellee Koehler's breach of contract claim, the District Court determined:

> that the parties reached an agreement at the June 17, 2003 meeting wherein Nancy Carroll agreed to pay Plaintiff his differential pay among other items and Defendant agreed to refrain from pursuing his complaint with the Department of Labor. Based on this finding, the Court further finds that Defendant Pepsi breached its oral contract with Plaintiff by failing to meet its agreed upon obligations.

*Koehler*, 2006 WL at *5.

Finally, with regard to Koehler's conversion claim, the District Court concluded:

> Because Pepsi withdrew $10,820.22 from Plaintiff's personal bank account without his authorization, the Court finds that this action amounts to a conversion of his property. . . . Based on the clear and convincing evidence admitted at trial, the Court finds that Pepsi's actions demonstrate malice, egregious fraud, oppression and insult and the Court awards punitive damages in the amount of $50,000.

*Koehler*, 2006 WL at *5.

On July 28, 2006, Pepsi moved the District Court to amend its findings and judgment. On

August 10, 2006, Koehler filed an application for an award of attorneys' fees and expenses. On December 21, 2006, the District Court denied Pepsi's motion to amend its findings and judgment and granted Koehler's application for attorneys' fees and expenses.

On January 19, 2007, Pepsi filed its notice of appeal.

### III.  Standard of Review

Following a bench trial, this Court reviews a district court's conclusions of law *de novo* and its findings of fact for clear error. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 550 (6th Cir. 2000) (citing FED. R. CIV. P. 52(a)).

The Appellant claims that the evidence presented to the District Court is insufficient to supports its findings regarding liquidated and punitive damages. This Court reviews "insufficiency claims *de novo*, without determining credibility or weighing evidence, and giving the prevailing party the benefit of all reasonable inferences." *Argentine v. United Steelworkers of America, AFL-CIO, CLC*, 287 F.3d 476, 483 (6th Cir. 2002) (citing *K & T Enters. v. Zurich Ins. Co.*, 97 F.3d 171, 175-76 (6th Cir.1996)). "The [challenge] should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant." *K & T*, 97 F.3d at 176 (citing *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir.1995); *Phelps v. Yale Sec, Inc.*, 986 F.2d 1020, 1023 (6th Cir.), *cert. denied*, 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993)).

In the specific context of a bench trial, Rule 52 of the Federal Rules of Civil Procedure further explains that "[a] party may later question the sufficiency of the evidence supporting the

findings." FED. R. CIV. P. 52(a)(5). However, Rule 52 cautions, "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." FED. R. CIV. P. 52(a)(6). Clear error exists "only when the reviewing court is left with the definite, firm conviction that a mistake has been made." *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). In making this determination, "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." FED. R. CIV. P. 52(a)(6).

We will review the District Court's awards of liquidated and punitive damages separately. We ultimately affirm the lower court.

## IV. Liquidated Damages Award

### A. Standard for Liquidated Damages Award under the USERRA

The USERRA provides that a district court may award liquidated damages "if the court determines that the employer's failure to comply with the provisions of this chapter was willful." 38 U.S.C. § 4323(d)(1)(C). The liquidated damages provision awards plaintiffs double the actual damages suffered under § 4323(d)(1)(B). § 4323(d)(1)(C).

Because the statute does not define "willful," courts have applied the interpretation of "willful" from other contexts[7] to the USERRA. *See e.g.*, *Maher v. City of Chicago*, 463 F.Supp.2d

---

[7] These contexts include: the Age Discrimination Employment Act, *see e.g.*, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125-30 (1985); the Fair Labor Standards Act, *see e.g.*, *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-135 (1988); and the Family Medical Leave Act, *see e.g.*, *Hoffman v. Prof'l. Med Team*, 394 F.3d 414, 417-18 (6th Cir. 2005).

837, 841-42 (N.D. Ill. 2006); *Duarte v. Agilent Techs., Inc.*, 366 F.Supp.2d 1039, 1048 (D. Colo. 2005); *Wrigglesworth v. Brumbaugh*, 129 F.Supp.2d.1106, 1110-11 (W.D. Mich. 2001); *Fink v. City of New York*, 129 F.Supp.2d 511, 523-24 (E.D. N.Y. 2001). As defined in these other contexts, an employer's violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the law at issue. *E.g.*, *Thurston*, 469 U.S. at 125-30 (finding this standard "consistent with the manner in which this Court has interpreted the term in other criminal and civil statutes"); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 614-17 (1993); *McLaughlin*, 486 U.S. at 133-35; *Hoffman*, 394 F.3d at 417-18. Once the Plaintiff shows willfulness, he or she need not show "that the employer's conduct was outrageous, or provide direct evidence of the employer's motivation." *Hazen Paper*, 507 U.S. at 617.

However, "[i]t is not enough to show that the employer knew that the [law] was 'in the picture' or that the employer 'acted without a reasonable basis for believing that it was complying with the statute.'" *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 423 (6th Cir. 1999) (citing *McLaughlin*, 486 U.S. at 132-34)). Courts have adopted a "'two-tiered liability scheme,' under which some, but not all, . . . violations . . . give rise to liquidated damages." *Hazen Paper*, 507 U.S. at 614. If an employer acts "reasonably and in good faith in attempting to determine whether [its] plan would violate" the law at issue, liquidated damages are not appropriate. *Thurston*, 469 U.S. at 129; *Hazen Paper*, 507 U.S. at 616; *McLaughlin*, 486 U.S. at 135.

We agree with and apply this interpretation of "willful."

**B. Discussion**

As a threshold matter, courts must find an underlying USERRA violation before they can

consider willfulness and the liquidated damages provision. While Pepsi was not clear in its briefs as to whether it challenged the District Court's finding of an underlying USERRA violation, at oral argument Pepsi's counsel said that Pepsi accepts the District Court's finding that it violated the USERRA. Therefore, we also accept the District Court's finding that the military pay differential is a "benefit" protected by the USERRA, 38 U.S.C. § 4303(2), and that Pepsi violated the USERRA by denying this benefit to Koehler, *see Jarrett v. Kassel*, 972 F.2d 1415, 1423 (6th Cir. 1992) (accepting the district court's conclusions that the parties do not contest on appeal), and proceed to the willfulness analysis.

Upon granting Koehler the benefit of all reasonable inferences from the evidence produced at trial, we affirm the District Court's finding that Pepsi acted willfully such that a liquidated damages award is appropriate.

First, there is sufficient evidence to support a finding that Pepsi knew or showed reckless disregard for whether its denial of the pay differential was prohibited by the USERRA. Pepsi obviously knew that it had established a benefit providing reimbursement for the difference in pay between what an employee earned at Pepsi and what the employee earned in the military. Pepsi, through Berger's office, was the entity that provided the policy to Koehler in the first place. Moreover, no one disputes that Koehler provided these same documents to Pepsi's Cincinnati Human Resources manager, Nancy Carroll, at the June 17, 2003 meeting.

The District Court had sufficient evidence to support its finding that the denial of the pay benefit violated the USERRA. Pepsi makes no challenge to this finding. Under the USERRA, "A person who is a member of . . . or has an obligation to perform service in a uniformed service shall

not be denied . . . any benefit of employment by an employer on the basis of that membership, . . . performance of service, application for service, or obligation." 38 U.S.C. § 4311(a). The term "benefit" includes "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice." 38 U.S.C. § 4303(2). Moreover, under the Act, it has been interpreted expansively. *E.g.*, *Pucilowski v. Dep't of Justice*, 498 F.3d 1341, 1344 (Fed.Cir. 2007) (citing *Yates v. Merit Sys. Prot. Bd.*, 145 F.3d 1480, 1484-85 (Fed.Cir.1998)).

The USERRA exempts employers from an obligation to pay benefits that are "wages or salary for *work performed*." 38 U.S.C. § 4303(2) (emphasis added). Here, Koehler did not perform any work for Pepsi during the period involved with the differential pay he sought. Rather, his claim rests upon Pepsi's own policy that promises differential pay to those employees called up to serve in the military.

Pepsi knew of or showed reckless disregard for its obligation to pay the pay differential as a benefit of Koehler's employment. By the time Pepsi both deposited and withdrew the funds, Pepsi's Human Resources Department in Cincinnati had a copy of Pepsi's military policy, the USERRA, and Koehler's pay stubs proving his military service and payment. Pepsi had sufficient information to know that it was violating the USERRA when it withdrew the funds.

Perhaps the strongest evidence supporting a finding of willfulness is that Pepsi agreed to and then deposited the differential pay amount into Koehler's account on July 3, 2003. The Appellant does not challenge, and therefore we accept, the District Court's finding that Pepsi agreed to pay

Koehler the differential pay amount it owed under its policy on June 17, 2003.[8]  Koehler's bank

statement shows that Pepsi deposited the amount at issue into his account on July 3, 2003.  The

logical explanation for this deposit is that Pepsi thought it owed Koehler these funds as a benefit

under its policy and the USERRA.  In other words, the agreement and deposit suggest that Pepsi

thought that if it chose not to so deposit the funds, it would be denying Koehler what it owed him

and acting in violation of the USERRA.

Moreover, Pepsi provides no reasonable argument as to why benefits were not owed under

the Pepsi policy or evidence to support a reasonable alternative explanation as to why the deposit

occurred.  In fact, before Koehler provided his bank statements as proof of the deposit and

withdrawal, Pepsi formally denied the deposit through its attorney, W. Scott Nehs.[9]  Then at trial,

once it became clear that Pepsi had deposited and withdrawn the funds, Carroll testified that she

could not explain how or why the deposit occurred.  Her only explanation was that the deposit

occurred with "no physical act," or "automatically."  She also stated that Pepsi had "no record[s]"

---

[8] Pepsi does not appeal the District Court's breach of contract conclusion: "and the Court found–and Pepsi does not challenge this on appeal–that an oral, binding contract . . . was created at the meeting."  As noted above, Pepsi does not challenge the District Court's finding of the underlying USERRA violation either.  Therefore, we accept both findings as well as how they are interconnected: the District Court found, and we agree, "that a benefit was conferred upon Plaintiff by operation of Pepsi's own policy and that this policy was reinforced by its own practice in the agreement that was reached at the June 17th meeting."

[9] In his November 7, 2003, letter discussing Koehler's claim, Nehs, says:

You have also made it a point to indicate that funds were deposited into Mr. Koehler's account then withdrawn as evidence of Pepsi's intent to pay and actual payment of compensation for Mr. Koehler's period of training.  I'm confident Mr. Koehler's bank records will reflect the fact that no deposit was ever made.  More importantly, Pepsi did not make this payment. . . . [N]o funds were ever deposited into Mr. Koehler's account.

of the deposit. The District Court regarded this testimony with suspicion, and so do we.

Without "determining credibility or weighing evidence, and giving the prevailing party the benefit of all reasonable inferences," we find sufficient evidence to support the District Court's finding of willfulness on the part of Pepsi. *See Argentine, 287 F.3d at 483*.

## C. Responses to Pepsi's Remaining Arguments

First, Pepsi argues that its denial of differential pay could not have been willful because Carroll did not have the authority to enter into such an agreement. Pepsi appears to be arguing that Pepsi was not bound by Carroll's promise on June 17, 2003.

Again, the District Court alternatively decided that Pepsi breached its obligation under the USERRA and also breached the agreement it reached in the June 17, 2003 meeting. Because Pepsi does not challenge the District Court's breach of contract conclusion, we accept the District Court's conclusions on the contract claim–that Carroll's oral agreement required the payment and implicitly, that Carroll had the authority to so bind Pepsi.

Even if we reviewed the District Court's implicit finding that Nancy Carroll bound Pepsi, we would affirm. Pepsi points to no evidence that Carroll lacked such authority. Meanwhile, the evidence in the record is to the contrary. Carroll, the Human Resources Manager for the Cincinnati plant, had the authority to bind Pepsi; she so bound the company when she agreed to expunge the attendance points from Koehler's record. Further, setting aside Carroll's oral promise, we have already discussed how Pepsi was bound by its own policy, and therefore the USERRA, to make such a payment anyway–and that Pepsi knew of, or at least acted in reckless disregard of this obligation. Accordingly, we reject Pepsi's first argument.

Pepsi knew its policy required differential pay for reservists going on active duty and knew that the USERRA protected this benefit. Koehler presented sufficient evidence showing that Pepsi at the least showed reckless disregard for whether its conduct was prohibited.

Finally, Pepsi claims that it acted in good faith as indicated by Carroll's communication with counsel and counsel's written opinion on the matter. We still find that the evidence presented above is sufficient to support a finding of willfulness despite any Pepsi communications with counsel and Koehler over the matter. Furthermore, the record suggests that Pepsi's communication with its counsel and Koehler was not in good faith. In particular, we draw attention to Pepsi's failure to communicate with Koehler (in response to his grievances and complaints as well as following its withdrawal of the funds) as well as Pepsi's counsel's initial denial that the deposit and withdrawal occurred in the first place.

## V. Punitive Damages

### A. Standard for Punitive Damages Awards

The plaintiff has the burden to "establish, by clear and convincing evidence, that the plaintiff is entitled to recover punitive or exemplary damages." *E.g.*, *Burns v. Prudential Secs., Inc.*, 167 Ohio App. 3d 809, 842, 857 N.E.2d 621, 646 (Ohio App. 2006) (citing O.R.C. § 2315.21(D)(4)).

Under Ohio law, a district court may grant punitive damages for conversion upon a finding of actual malice. "Actual malice" for these purposes is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Calmes*

*v. Goodyear Tire & Rubber Co.*, 61 Ohio St. 3d 470, 473, 575 N.E.2d 416, 419 (Ohio 1991) (citing

*Preston v. Murty,* 32 Ohio St. 3d 334, 512 N.E.2d 1174, syllabus (Ohio 1987)).  Actual malice "can

be inferred from conduct and surrounding circumstances which may be characterized as reckless,

wanton, willful or gross."  *E.g.*, *Barker v. Netcare Corp.*, 147 Ohio App. 3d 1, 15, 768 N.E.2d 698,

710 (Ohio App. 2001).

## B. Discussion

First, we incorporate our willfulness analysis above to support a finding of actual malice on

the basis of "conduct and surrounding circumstances which may be characterized as . . . willful."

*See Barker*, 768 N.E.2d at 710.

In addition, upon giving Koehler the benefit of all reasonable inferences, we find sufficient

evidence to support a finding that Pepsi acted with "hatred, ill will or a spirit of revenge."  *See*

*Calmes*, 575 N.E.2d at 419.  First, one could reasonably infer that Pepsi withdrew the funds under

a spirit of ill will or revenge in reaction to Koehler's  grievances, complaints, and ultimately his e-

mail to Pepsi's corporate office threatening to go public with Pepsi's treatment of him.  Pepsi's

failure to respond to Koehler's grievances and complaints regarding his attendance-related discipline

further suggests such ill will.  One could similarly infer that Carroll acted with such a spirit in

response to Koehler making Carroll look bad through his communications with Pepsi's corporate

headquarters.  Carroll's hostility during her one-on-one meeting with Koehler before the meeting on

June 17, 2003, provides additional evidence that she was acting with ill will towards Koehler.

Second, Pepsi's initial denial of the deposit and withdrawal and then at trial, its failure to

explain how and why the deposit occurred also suggest ill will.  Even though Webber-Kauffman

admitted that Pepsi had withdrawn the funds because it changed its mind, Pepsi's counsel initially denied that the deposit and withdrawal took place at all. After Koehler presented his bank records, at trial, Nancy Carroll could not or, rather, would not explain how the deposit occurred. She could only say that the deposit must have happened "automatically" and that she had no records of the deposit. "All of this evidence is more than adequate to support a conclusion [that the Appellant's] behavior in this case amounted to much more than mere negligence [or a "simple mistake"] but rather could be characterized as intentional, deliberate and akin to deceit." *Argentine*, 287 F.3d at 488.

**C. Responses to Pepsi's Remaining Arguments**

First, Pepsi argues that Koehler should not receive punitive damages because his conversion claim is directly related to his contract claim. The Appellant states that punitive damages are generally not recoverable for breach of contract claims. *Id.* Because Koehler's conversion victory arguably depends on his breach of contract claim, Pepsi says that "the district court indirectly awarded Koehler a windfall to which he was not entitled." *Id.*

Pepsi is correct that under Ohio law, courts generally do not award punitive damages upon findings of breach of contract. *In re: Graham Square, Inc.*, 126 F.3d 823, 828 (6th Cir. 1997). However, Pepsi's cited case on this point also provides the exception to the rule:

> "Because the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach, '[p]unitive damages are not recoverable for a breach of contract *unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.*'"

*Id.* (citations omitted) (emphasis added). In an action involving both tort and breach of contract

claims, a plaintiff may recover punitive damages if the "breach of contract is accompanied by a connected, but independent tort involving fraud, malice or oppression." *E.g., McMahon v. Alternative Claims Servs., Inc.*, 2007 WL 4119163, *4 (N.D. Ohio 2007) (permitting potential punitive damages recovery for intentional infliction of emotional distress tort tied to breach of contract claim); *Burns v. Prudential Secs., Inc.*, 167 Ohio App. 3d 809, 857 N.E.2d 621 (Ohio App. 2006) (permitting punitive damages recovery for breach of fiduciary duty and negligent supervision in a breach of contract action). The exception "permits punitive damages not for the breach of contract, but for the tortious conduct." *Mabry-Wright v. Zlotnik*, 165 Ohio App. 3d 1, 7, 844 N.E.2d 858, 863 (Ohio App. 2005) (citations omitted). Here, conversion is such an independent tort that allows punitive damage recovery upon a showing of malice. *E.g.*, *Drayton v. Jiffee Chem. Corp.*, 591 F.2d 352, 365 (6th Cir. 1978) (noting that punitive damage recovery has "become commonplace in actions involving . . . conversion, and other wrongs of a similar nature").

Pepsi does not contest the District Court's legal conclusion finding conversion. As described above, this Court finds sufficient evidence of malice to affirm the District Court's award of punitive damages to Koehler based on Pepsi's conversion. Under the exception to the rule described above, Pepsi cannot escape punitive damages just because the same conduct is also a breach of contract.

Pepsi also argues that the punitive damages award is excessive because Koehler is in effect receiving "double punitive damages" in the form of both liquidated damages under the USERRA and punitive damages under his conversion claim. Pepsi provides no additional legal or factual argument on this point. Although some courts have considered the USERRA's liquidated damages to be punitive, the case law is not settled on this point. *Compare Duarte v. Agilent Tech., Inc.*, 366

F.Supp.2d 1036, 1037-38 (D.Colo.2005) (noting and agreeing with the decisions by several courts that liquidated damages based on willfulness constitute a punitive remedy), *with Vander Wal v. Sykes Enters., Inc.*, 377 F.Supp.2d 738, 746 (D.N.D. 2005) (describing the USERRA as awarding liquidated damages and not punitive damages, thereby distinguishing between the two). Assuming, without deciding, that the USERRA's liquidated damages provision is punitive in nature, we cannot agree with Pepsi that the instant award is excessive just because it includes both liquidated damages and punitive damages components. The USERRA limits its award of liquidated damages to double the actual damages owed. 38 U.S.C. § 4323(d)(1)(C). The Court finds that it would be reasonable for a district court to award punitive damages, beyond the liquidated damages amount, to effectuate the purposes of punitive damages: "to punish the guilty party and deter tortious conduct by others." *Digital & Analog Design Corp. v. North Supply Co.*, 63 Ohio St. 3d 657, 660 (Ohio 1992), *overruled on other grounds*; *see also Winkler*, 124 Fed.Appx. at 936. Also, the case was tried to the District Court without a jury, and the Judge would have known that both liquidated and punitive damages would be awarded. With no argument as to why the particular amount of punitive damages awarded is excessive, we will not find that the award is excessive just because it grants both liquidated and punitive damages in the same case.

## VI. Conclusion

For the reasons discussed above, we AFFIRM the District Court's awards of liquidated and punitive damages to Koehler.